1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   ASHLI HEALTHCARE, INC.,              No. 1:23-cv-1443 WBS BAM

13              Plaintiff,

14       v.
                                          MEMORANDUM AND ORDER RE:
15   ROBERT F. KENNEDY, JR.,[1] in his    MOTIONS FOR SUMMARY JUDGMENT
     official capacity as Secretary,
16   United States Department of
     Health and Human Services,

17              Defendant.

18

19                              ----oo0oo----

20          Plaintiff Ashli Healthcare, Inc. ("Ashli" or

21   "plaintiff") brought this action seeking judicial review of the

22   final decision of the United States Department of Health and

23   Human Services ("defendant" or "Secretary").  (First Amended

24   Compl. ("FAC") (Docket No. 23).)  Both parties have moved for

25   summary judgment.  (Docket Nos. 39-40.)  The court held hearings

26   _____

27          [1]    Pursuant to Federal Rule of Civil Procedure 25(d),
     Secretary of Health and Human Services Robert F. Kennedy, Jr.,
     has been substituted for former Secretary of Health and Human
28   Services Xavier Becerra.  (Docket No. 56.)

                                     1

1  on the motions on January 21 and February 20, 2025.

2  I.    Medicare Payment and Review

3         "Medicare is a federally funded program that reimburses

4  healthcare providers for delivering medical care to qualifying

5  elderly and disabled individuals."  New LifeCare Hosps. of N.C.,

6  LLC v. Becerra, 7 F.4th 1215, 1219 (D.C. Cir. 2021).  The

7  Department of Health & Human Services ("HHS") administers

8  Medicare via the Centers for Medicare and Medicaid Services

9  ("CMS").  Id.  The federal government spends about "half a

10  trillion dollars" per year on Medicare.[2]  Palm Valley Healthcare

11  v. Azar, 947 F.3d 321, 323-24 (5th Cir. 2020).  This is in part

12  due to providers and beneficiaries filing "over 1 billion claims"

13  with Medicare every year.  MedEnvios Healthcare, Inc. v. Becerra,

14  725 F. Supp. 3d 1343, 1348-50 (S.D. Fla. 2024), reconsideration

15  denied, No. 23-20068-Civ, 2024 WL 3251329, at *2-3 (S.D. Fla.

16  July 1, 2024).[3]

17         Medicare pays about 98% of these claims with minimal

18  review.  United States v. Bergman, 852 F.3d 1046, 1054 (11th Cir.

19  2017); Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health &

20  Human Servs., 468 F.3d 1347, 1349 (11th Cir. 2006).  A provider

21

22         [2]    The court uses the term "Medicare" to refer
   collectively to the various government agencies and contractors
23  involved with administering the Medicare program, including the
   Department of Health and Human Services, the Centers for Medicare
24  and Medicaid Services, and the various contractors involved in
   processing, reviewing, paying, and auditing claims and appeals.
25

26         [3]    Because of the similarities between this action and the
   MedEnvios action in the Southern District of Florida (which
27  involves the same counsel for plaintiff in this action and many
   of the same claims), the court will refer to the multiple
28  decisions issued by the court in MedEnvios in this opinion.

1  or supplier dissatisfied with Medicare's resolution of a

2  particular claim may appeal the decision through an

3  administrative appeals process, and then, after exhausting the

4  administrative process, may seek review by a federal district

5  court.  Gulfcoast, 468 F.3d at 1349 (citing 42 U.S.C. § 405,

6  1395ff(b)(1)(A); 42 C.F.R. § 405.801).  A provider or supplier

7  has 120 days to appeal Medicare's initial decision as to a

8  particular claim, and one year to "reopen" a claim to provide new

9  evidence and get a new determination.  42 C.F.R. §§ 405.942(a),

10  405.980(c).

11      Because prepayment review of all of the over 1 billion

12  annual Medicare claims would be unfeasible, Medicare relies in

13  part on post-payment audits to ensure the claims are medically

14  necessary and meet the requirements of the Medicare program.

15  MedEnvios, 725 F. Supp. 3d at 1346.  To review Medicare claims,

16  Congress created the Medicare Integrity Program, through which

17  Medicare contracts with private entities "for the purpose of

18  identifying underpayments and overpayments, and recouping

19  overpayments."  42 U.S.C. §§ 1395ddd(a), (h)(1).  When Medicare

20  determines via these audits that a provider or supplier has been

21  overpaid for its claims, it may assess an "overpayment" against

22  it.  See 42 U.S.C. § 1395ddd(b).[4]  In other words, Medicare

23  ───────────────

24      [4]    Under Medicare, a "provider of services" or "provider"
   is "a hospital, critical access hospital, skilled nursing
25  facility, comprehensive outpatient rehabilitation facility, home
   health agency, hospice program, or . . . a fund."  42 U.S.C.
26  § 1395x(u).  A "supplier" is "a physician or other practitioner,
   a facility, or other entity (other than a provider of services)
27  that furnishes items or services" to Medicare beneficiaries.  42
   U.S.C. § 1395x(d).  For purposes of this order, the court uses
28  the terms provider and supplier interchangeably.

3

1  demands that the provider repay the amount it received in excess

2  of Medicare's allowed reimbursement.

3          To determine overpayments, federal law authorizes

4  Medicare to investigate a sample of a provider's Medicare claims.

5  See 42 U.S.C. § 1395ddd(f).  If the audit of that sample reveals

6  "a sustained or high level of payment error," Medicare may take

7  the sample's overpayment rate and apply to it to a "universe," or

8  larger number of similar claims, to extrapolate a total

9  overpayment amount.  Medicare may then demand that overpayment

10  amount from the Medicare provider.  See 42 U.S.C.

11  § 1395ddd(f)(3).

12  II.  Ashli's Audit and Administrative Appeals

13          Ashli is a California corporation which supplies

14  medical equipment, including ventilators and other respiratory

15  equipment, to Medicare beneficiaries.  (Administrative Record

16  ("R.") at 1615.)[5]  In 2022, a Medicare contractor performed an

17  audit of Ashli's claims from November 19, 2019, and November 19,

18  2020.[6]  (R. at 999-1000.)  The contractor took a sample of 90

19  claims out of the universe of the 5,545 claims submitted by Ashli

20  that Medicare fully or partially paid during that date range,

21  excluding the "zero-paid" claims, meaning those claims for which

22  Ashli received no payment.  (Id.)  The contractor determined that

23  some of those 90 claims did not meet Medicare requirements, and

24  then extrapolated the amount that plaintiff was overpaid on those

25          [5]   Defendant lodged the full administrative record with
26  the court instead of filing it via the court's electronic case
   management system.  (See Docket No. 24.)

27

28          [6]   The audit was performed by Unified Program Integrity
   Contractor Qlarant Integrity Solutions, LLC.  (R. at 999-1002.)

90 claims to the universe of 5,545 total claims to calculate a total overpayment amount of $1,354,864.00.  (R. at 3877-4150 (initial determinations of claims); id. at 999-1002, 3785-808 (statistical extrapolation).)

After Medicare informed plaintiff of the overpayment assessment on March 28, 2022, plaintiff requested redetermination of the demanded amount.  (R. at 3746.)  On this first level of the appeals process, in a lengthy decision, the Medicare Administrative Contractor[7] found that some of the disallowed claims from the 90-claim sample met Medicare requirements but upheld the contractor's sampling method on June 22, 2022, resulting in a reduced overpayment demand.[8]  (R. at 3745-84.)

Ashli then sought reconsideration of the demand from the appropriate Qualified Independent Contractor[9] on August 18, 2022.  On this second level of the appeals process, through another lengthy decision, the contractor upheld the sampling method used below but allowed some previously disallowed claims

---

[7]    The Medicare Administrative Contractor who issued the decision on the first level of appeal was Noridian Healthcare Solutions, LLC.  (R. at 3745.)

[8]    As explained by one court, "[f]ollowing partially favorable decisions on appeal, the relevant contractor must 'effectuate' the decision by recalculating the extrapolated overpayment amount to be recouped from the supplier based upon the revised decisions on individual sampled Medicare claims." MedEnvios, 725 F. Supp. 3d at 1350.  Based on this recalculated amount, after each administrative appeal, plaintiff received a partial refund.  However, plaintiff did not always receive a new demand letter with the recalculated overpayment amount after each appeal decision.

[9]    The Qualified Independent Contractor who issued the decision on the second level of appeal was Maximus DME QIC.  (R. at 6113.)

5

1  from the 90-claim sample, which ultimately reduced defendant's
2  overpayment demand to $1,209,103.00, on October 17, 2022.  (R. at
3  991-92, 6113-69.)

4         Ashli then requested a hearing before an Administrative
5  Law Judge ("ALJ"), the third level of the appeals process, and
6  the hearing was held on April 5, 2023.  (R. at 3246-50, 7281.)
7  Plaintiff once again challenged the statistical methodology which
8  the Medicare contractor used to extrapolate its overpayment rate
9  and also challenged some of the determinations as to some of the
10 90 claims in the sample.  (R. at 3246-50.)  On May 2, 2023, the
11 ALJ issued a lengthy and thorough decision upholding defendant's
12 statistical methodology but allowing some of the previously
13 disallowed claims for various elaborated reasons, resulting in a
14 further reduced overpayment demand of $1,091,621.86.  (See R. at
15 353-87.)

16         After the Medicare Appeals Council declined to act on
17 Ashli's request for review of the ALJ decision (R. at 2-3), Ashli
18 filed the instant action bringing five procedural due process
19 claims against the Secretary in his official capacity.
20 (See FAC ¶¶ 4-6.)  Ashli does not challenge the ALJ's
21 determinations as to any of the individual claims within the 90-
22 claim sample, including those claims which the ALJ held were
23 properly denied.

24 III. Standard of Review

25         The Social Security Act authorizes judicial review of a
26 "final decision" of the Secretary of Health and Human Services
27 "made after a hearing."  See 42 U.S.C. §§ 405(g)-(h).  The
28 Medicare Act incorporates this provision of the Social Security

1  Act.  See 42 U.S.C. § 1395ff(b).  The ALJ decision constitutes

2  the "final decision" of the Secretary where the Medicare Appeals

3  Council has declined to review it.  See 42 C.F.R.

4  §§ 405.1048(a)(1), 405.1132.

5      A party may move for summary judgment to seek judicial

6  review of an administrative agency's final decision.  Nw.

7  Motorcycle Ass'n v. USDA, 18 F.3d 1468, 1471-72 (9th Cir. 1994).

8  Since the court "sits as an appellate tribunal" when reviewing an

9  appeal from an ALJ's decision, it does not apply the ordinary

10  summary judgment standard of Federal Rule of Civil Procedure

11  56(a).  California v. HHS, 473 F. Supp. 3d 992, 1000-01 (N.D.

12  Cal. 2020).  Here, the court evaluates whether defendant's

13  decision is "arbitrary, capricious, an abuse of discretion, or

14  otherwise not in accordance with law;" "contrary to

15  constitutional right, power, privilege, or immunity;" "in excess

16  of statutory jurisdiction, authority, or limitations, or short of

17  statutory right;" or "without observance of procedure required by

18  law" under the Administrative Procedure Act.  5 U.S.C. § 706(2).[10]

19  IV.  Discussion

20      Plaintiff argues that the procedures used throughout

21  the overpayment calculation and appeals processes violated its

22  procedural due process rights and brings five related due process

23  claims.  The first claim concerns the exclusion of claims where

24  plaintiff did not receive any payment or reimbursement, or "zero-

25      [10]  In addition, courts reviewing an ALJ's decision

26  typically evaluate whether "substantial evidence" supports the
    ALJ's factual findings under 42 U.S.C. § 405(g).  Because

27  plaintiff is not challenging any of the ALJ's factual
    determinations as to the 90 individual claims within the sample,

28  § 405(g) does not apply to any issue before this court.

1  paid" claims, from the universe of claims reviewed by the audit.

2  The second claim concerns defendant's disclosure of a computer

3  file containing the universe of claims, where the universe

4  excluded zero-paid claims.  The third claim concerns defendant's

5  failure to provide recalculation worksheets after each level of

6  administrative review that resulted in reduced overpayment

7  amounts.  The fourth claim alleges improper recoupment of funds,

8  and the fifth claim alleges improper accounting for payments made

9  by plaintiff.

10       The Fifth Amendment provides that a person will not "be

11  deprived of life, liberty, or property, without due process of

12  law."  U.S. Const. amend. V, cl. 4.  "A procedural due process

13  claim has two distinct elements: (1) a deprivation of a

14  constitutionally protected liberty or property interest, and (2)

15  a denial of adequate procedural protections."  Brewster v. Bd. of

16  Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 982 (9th Cir.

17  1998).

18       A.    Protected Property Interest

19       Neither the Supreme Court nor the Ninth Circuit has

20  addressed whether a Medicare provider has a protected property

21  interest in funds paid by Medicare that are subject to

22  overpayment recoupment.  Some lower courts have reasoned that

23  providers "have no property interest in Medicare overpayments,"

24  which constitute "a level of benefits that is greater than

25  Congress has provided."  See, e.g., Sahara Health Care, Inc. v.

26  Azar, 349 F. Supp. 3d 555, 571-72 (S.D. Tex. 2018), aff'd on

27  other grounds, 975 F.3d 523, 533-34 (5th Cir. 2020) (quoting

28  Greater Dallas Home Care All. v. United States, 10 F. Supp. 2d

638, 646 (N.D. Tex. 1998)); In Touch Home Health Agency, Inc. v. Azar, 414 F. Supp. 3d 1177, 1190 (N.D. Ill. 2019); Alpha Home Health Sols., LLC v. Sec'y of U.S. Dep't of Health & Hum. Servs., 340 F. Supp. 3d 1291, 1303 (M.D. Fla. 2018); see also Pers. Care Prods., Inc. v. Hawkins, 635 F.3d 155, 159 (5th Cir. 2011) (there is no "property right in Medicaid reimbursements to a provider that is the subject of a fraud investigation").

However, that reasoning oversimplifies the issue presented here.  Plaintiff is not claiming a property interest in any funds it received in violation of Medicare requirements. Rather, plaintiff "claims an interest for properly billed claims that are now being recouped by the government."  See Med-Cert Home Care, LLC v. Azar, 365 F. Supp. 3d 742, 750-51 (N.D. Tex. 2019) (emphasis added).  In other words, plaintiff claims that because of defendant's alleged sampling and extrapolation errors, defendant has overestimated plaintiff's overpayment and is therefore demanding recoupment of funds that plaintiff was entitled to receive.

A party possesses a protected property interest in a "government benefit" where it has a "legitimate claim of entitlement to it" based on an "independent source" such as a statute or regulation, rather than merely an "abstract need or desire" or "unilateral expectation."  See Gerhart v. Lake County, 637 F.3d 1013, 1019 (9th Cir. 2011) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).  Such interest has been characterized as "new" property, as contrasted with "old" property such as land or chattels.  See Johnson v. Ryan, 55 F.4th 1167, 1191-92 (9th Cir. 2022).

1      The court finds that plaintiff in this case reasonably
2  had such a claim of entitlement to retain the sums at issue here.
3  Specifically, the extensive regulations and guidance promulgated
4  by Medicare establish that if providers comply with the
5  substantive and procedural requirements set out by the agency,
6  they will receive reimbursement for services provided to
7  beneficiaries.  See, e.g., 42 U.S.C. §§ 1395k-1395n; 42 C.F.R.
8  § 410.38; Ctrs. for Medicare & Medicaid Servs., No. 100-04,
9  Medicare Claims Processing Manual, https://www.cms.gov/
10  regulations-and-guidance/guidance/manuals/internet-only-manuals-
11  ioms-items/cms018912.

12      This court's conclusion is consistent with the
13  decisions of several other courts which have held that Medicare
14  providers possess "a legitimate claim of entitlement to
15  reimbursement at the rate as established under the law."  See,
16  e.g., Rock River Health Care, LLC v. Eagleson, 14 F.4th 768, 774
17  (7th Cir. 2021) (citing Am. Soc'y of Cataract & Refractive
18  Surgery v. Thompson, 279 F.3d 447, 455 (7th Cir. 2002)); Furlong
19  v. Shalala, 156 F.3d 384, 393 (2d Cir. 1998) ("professionals who
20  provide services under a federal program such as Medicaid or
21  Medicare have a property interest in reimbursement for their
22  services at the 'duly promulgated reimbursement rate'");
23  Accident, Inj. & Rehab., PC v. Azar, No. 18-cv-02173, 2018 WL
24  4625791, at *7 (D.S.C. Sept. 27, 2018) (a provider "certainly has
25  a property interest in the ongoing Medicare payments for services
26  rendered to patients"), vacated on other grounds, 943 F.3d 195,
27  204-05 (4th Cir. 2019); Morrison v. Sebelius, No. 11-cv-1002,
28  2013 WL 3288167, at *4 (S.D. Ohio June 28, 2013) (Medicare

provider possessed a property interest in "payment for services she actually rendered").

Medicare providers possess this property interest because "the statutes and regulations governing the distribution of benefits 'meaningfully channel official discretion by mandating a defined administrative outcome.'"  See Barrows v. Burwell, 777 F.3d 106, 113 (2d Cir. 2015) (quoting Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005)) (holding that Medicare beneficiaries may possess a property interest in inpatient hospital admission where "the Secretary -- acting through CMS -- has effectively established fixed and objective criteria for when to admit Medicare beneficiaries as 'inpatients'"); see also Doyle v. City of Medford, 606 F.3d 667, 673-74 (9th Cir. 2010) ("a statute may create a property interest if it mandates a benefit when specific non-discretionary factual criteria are met"); Mustafa v. Clark Cnty. Sch. Dist., 157 F.3d 1169, 1178 (9th Cir. 1998) (quoting Stiesberg v. California, 80 F.3d 353, 356 (9th Cir. 1996)) (a property interest exists where "'procedural requirements are intended to be a significant substantive restriction on . . . decision making'").

In contrast, some courts have expressed the view that "health care providers 'are not the intended beneficiaries of the federal health care programs'" and they do not themselves have a property interest in Medicare participation.  See Shah v. Azar, 920 F.3d 987, 997-98 (5th Cir. 2019) (quoting Parrino v. Price, 869 F.3d 392, 398 (6th Cir. 2017)) (collecting cases).  In none of those cases, however, does it appear that the providers were seeking to recover as assignees of the beneficiaries; rather, the

1    providers in those cases asserted a far more general interest in

2    participation in federal health care programs.

3         One such case was Guzman v. Shewry, in which the Ninth

4    Circuit held, in the context of a provider challenging wholesale

5    suspension from the Medicaid program, that a provider "does not

6    possess a property interest in continued participation in

7    Medicare, Medicaid, or the federally-funded state health care

8    programs." 552 F.3d 941, 953 (9th Cir. 2009) (citing Erickson v.

9    U.S. ex rel. Dep't of Health & Hum. Servs., 67 F.3d 858, 861 (9th

10   Cir. 1995)). Similarly, in Parrino, the Sixth Circuit held that

11   there is no property interest in "being a provider in all federal

12   health care programs," 869 F.3d at 397; in Koerpel v. Heckler,

13   the Tenth Circuit held that there was "no property interest in [a

14   provider's] continuing eligibility for Medicare reimbursement"

15   where the provider had been excluded entirely from the program,

16   797 F.2d 858, 865 (10th Cir. 1986); and in Cervoni v. Secretary

17   of Health, Education & Welfare, the First Circuit held that

18   "physicians do not have a protectable property interest in their

19   continuing eligibility to bill for reimbursement" under a

20   particular Medicare classification scheme, which "d[id] not

21   affect specific bills which [the provider] may submit for

22   payment," 581 F.2d 1010, 1018-19 (1st Cir. 1978).

23        Unlike the providers in those cases, Ashli is not

24   merely asserting a general interest in eligibility for the

25   Medicare program, but rather is acting as the assignee of the

26   individual beneficiaries on whose behalf it submitted specific

27   claims for reimbursement. As the Ninth Circuit held in K.W. ex

28   rel. D.W. v. Armstrong, 789 F.3d 962, 972 (9th Cir. 2015),

1    beneficiaries of federally funded health insurance programs can

2    possess a property interest in those benefits.  Because the

3    Medicare statute "permits . . . patients to assign their rights

4    to payment [to providers]," see Furlong, 156 F.3d at 392 (citing

5    42 U.S.C. §§ 1395u(b)(3)(B)(ii), (h)(1)), Ashli possesses a

6    property interest in its capacity as the assignee of individual

7    Medicare beneficiaries.

8           To be clear, this court does not go so far as to

9    conclude that plaintiff is in fact entitled to all the funds at

10   issue.  The validity of the extrapolated overpayment demand is

11   the very subject of dispute between the parties.  However, "the

12   Fifth Amendment Due Process Clause protects even disputed

13   interests in property."  Dominion Ambulance, L.L.C v. Azar, 968

14   F.3d 429, 441 (5th Cir. 2020).  Indeed, "'[a]n interest that

15   gives rise to an entitlement is always a conditional interest,'

16   because if the plaintiff possessed an absolute right there would

17   be no need for a hearing as there would be no issue to resolve."

18   Rock River, 14 F.4th at 774-75 (quoting Geneva Towers Tenants

19   Org. v. Federated Mortgage Investors, 504 F.2d 483, 494 (9th Cir.

20   1974) (Hufstedler, J., dissenting)).

21          "The existence of procedures that would assess the

22   entitlement to that interest is not a basis to deny the existence

23   of the property interest," nor does "defendant's belief that the

24   plaintiff cannot succeed on that claim [] eliminate the need to

25   provide due process."  Id. at 775.  "'Property cannot be defined

26   by the procedures provided for its deprivation any more than can

27   life or liberty.'"  Armstrong, 789 F.3d at 973 (quoting Cleveland

28   Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)) (cleaned

1    up).

2          Plaintiff's asserted claim to Medicare reimbursements

3    goes beyond the abstract.  Plaintiff has successfully appealed

4    multiple disallowances of claims, resulting in a lower

5    overpayment amount at each level of review.  Based on defendant's

6    own multi-level review process which showed these erroneous

7    disallowances, plaintiff did, in fact, have a right to some of

8    the funds sought to be recouped based on defendant's initial

9    overpayment demand.

10         Because the court finds that plaintiff has a protected

11   property right in the funds at issue, it next turns to the

12   question of whether plaintiff was afforded due process.

13         B.    Due Process

14         In Mathews v. Eldridge, 424 U.S. 319, 333-35 (1976),

15   the Supreme Court set forth how a court should determine whether

16   a government procedure which deprives someone of a protected

17   property interest satisfies due process.  "The fundamental

18   requirement of due process is the opportunity to be heard 'at a

19   meaningful time and in a meaningful manner.'"  Mathews, 424 U.S.

20   at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

21   Determining whether an administrative review process provides a

22   meaningful opportunity to be heard requires balancing "three

23   distinct factors."  Id. at 334-35.  The factors are (1) "the

24   private interest that will be affected by the official action;"

25   (2) "the risk of an erroneous deprivation," including "the

26   probable value, if any, of additional or substitute safeguards;"

27   and (3) "the government's interest, including the function

28   involved and the fiscal and administrative burdens that the

1  additional or substitute procedural requirement would entail."

2  Id.; see also Diamond S.J. Enter., Inc. v. City of San Jose, 10

3  F.4th 1059, 1068-69 (9th Cir. 2024) (applying same test).

4          With these factors in mind, the court now turns to each

5  of plaintiff's claims.

6          1.   Count 1: Exclusion of Zero-Paid Claims

7          Plaintiff argues that it was denied due process by

8  defendant's practice of excluding zero-paid claims from both the

9  universe of claims from which it drew the 90-claim sample and the

10  sample itself, thus leading to a higher extrapolated overpayment

11  amount than if those claims had been included.  Plaintiff does

12  not challenge generally the use of audits that examine a sample

13  of claims and then extrapolate the findings of that review to a

14  larger group of claims.[11]  Further, as mentioned above, plaintiff

15  does not challenge any of the ALJ's findings with respect to any

16  claim within the 90-claim sample.

17          a.   Interpretation of Regulatory Guidance

18

19          [11]   The Ninth Circuit has upheld "the use of sampling and

20  extrapolation as part of audits in connection with Medicare and
   other similar programs."  See Ratanasen v. Cal. Dep't of Health

21  Servs., 11 F.3d 1467, 1469-71 (9th Cir. 1993); see also United
   States v. Rite Aid Corp., No. 2:12-cv-1699 KJM EFB, 2020 WL

22  3970201, at *6-7 (E.D. Cal. July 14, 2020) ("The Ninth Circuit
   has generally permitted the practice [of statistical

23  extrapolation] when evaluating Medi-Care claims, for some
   time.").  Every other federal court of appeals to consider the

24  issue has similarly found that CMS' use of statistical
   extrapolation is not constitutionally problematic.  See, e.g.,

25  Ill. Physicians Union v. Miller, 675 F.2d 151, 155-56 (7th Cir.
   1982); Chaves Cnty. Home Health Serv., Inc. v. Sullivan, 931 F.2d

26  914, 922-23 (D.C. Cir. 1991); Yorktown Med. Lab'y, Inc. v.
   Perales, 948 F.2d 84, 89-90 (2d Cir. 1991); United States v.

27  Lahey Clinic Hosp., Inc., 399 F.3d 1, 18 & n.19 (1st Cir. 2005);

28  Dominion Ambulance, 968 F.3d at 438-42.

15

1    Initially, plaintiff argues that the exclusion of zero-
2    paid claims from the universe does not comply with the Medicare
3    Program Integrity Manual, which directs HHS how to choose a
4    subset of Medicare claims from which it extrapolates an
5    overpayment rate.  See Ctrs. for Medicare & Medicaid Servs., No.
6    100-08, Medicare Program Integrity Manual ("Manual")
7    § 8.4.3.2.1.B. (Apr. 21, 2023), https://www.cms.gov/ regulations-
8    and-guidance/guidance/manuals/downloads/pim83c08.pdf.  The
9    instruction at issue reads: "The universe shall consist of all
10   fully and partially paid claims submitted by the
11   provider/supplier for the period selected for review and for the
12   sampling units to be reviewed."  Id.  The instruction further
13   explains that "[s]ampling units with no final payment made at the
14   time of sample selection should not be included in the sampling
15   frame."  Id.

16       Notwithstanding this guidance, plaintiff contends that
17   the court should not give any deference to defendant's
18   interpretation of the Manual because the Supreme Court's recent
19   decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369
20   (2024), overruled Chevron U.S.A., Inc. v. Natural Resources
21   Defense Council, Inc., 467 U.S. 837 (1984), and its rule that
22   courts should defer to agency interpretations of ambiguous
23   statutes.  However, Loper Bright does not apply to the Manual.
24   Chevron only required that a court defer to an agency's
25   interpretation of an ambiguous statute.  Loper Bright, 603 U.S.
26   at 377-80, 396-98.  Because the Manual is not a statute,
27   defendant's interpretation of an ambiguous statute is not at
28   issue here.  See id. at 390-91 n.3.  "Interpretations contained

16

1  in policy statements, agency manuals, and enforcement guidelines,

2  all of which lack the force of law -- do not warrant <u>Chevron</u>-

3  style deference." <u>GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.</u>,

4  909 F.3d 1214, 1218-19 (9th Cir. 2018) (capitalization altered).[12]

5      Instead, an agency's interpretation of its own

6  regulatory manual may receive a different kind of deference under

7  <u>Auer v. Robbins</u>, 519 U.S. 452 (1997).  Under <u>Auer</u>, a court gives

8  deference to an administrative agency's reasonable interpretation

9  of its own rule when that rule is ambiguous.  <u>See</u> <u>Kisor v.</u>

10 <u>Wilkie</u>, 588 U.S. 558, 567-68, 572-73 (2019) (plurality opinion).

11 Although <u>Loper Bright</u> overruled <u>Chevron</u>, it did not overrule

12 <u>Auer</u>.  <u>See</u> <u>Rana v. Jenkins</u>, 113 F.4th 1058, 1067 (9th Cir. 2024)

13 (stating the Supreme Court did not abrogate <u>Auer</u> when it could

14 have done so in <u>Kisor</u> or <u>Loper Bright</u>), <u>cert. denied</u>, No. 24-550

15 (U.S. Jan. 21, 2025).

16     Regardless, the court need not defer to defendant's

17 interpretation of the Manual to resolve the instant action

18 because § 8.4.3.2.1.B of the Manual is not ambiguous in the first

19 place.  It directs Medicare contractors to take a sample of

20 claims from a universe which includes only "fully and partially

21 paid claims."  Defendant reimburses these "fully and partially

22 paid" Medicare claims to at least some extent, which means that

23 they are not zero-paid claims.  Accordingly, based on the

24 language of the Manual, the overpayment audit is not required to

25 include zero-paid claims in the universe or sample.

26

---

27     [12]  At the hearing held on January 21, 2025, Ashli's
   counsel could not give an example of ambiguous language contained
28 in any of the statutes the parties cited in the briefing.

Other district courts addressing this issue have come to the same conclusion.  The court in MedEnvios rejected plaintiff's interpretation of § 8.4.3.2.1.B of the Manual because its language, as read in the context of the underlying statute, "does not permit . . . the logical jump that all Medicare program integrity contractors are required to include [zero-paid] claims in all of their audits."  See MedEnvios, 725 F. Supp. 3d at 1349; see also MedEnvios Healthcare, Inc. v. Becerra, No. 23-20068-Civ, 2024 WL 4894677, at *4-5 (S.D. Fla. Nov. 26, 2024) (reaching same result after renewed cross-motions for summary judgment).  The court in Compass Laboratory similarly concluded that based on the language of § 8.4.3.2.1.B of the Manual, "the universe of claims need not include zero-paid claims."  Compass Lab'y Servs., LLC v. Becerra, No. 22-cv-2770, 2024 WL 1289696, at *5 (W.D. Tenn. Mar. 26, 2024); see also John Balko & Assocs. v. Sebelius, No. 12cv0572, 2012 WL 6738246, at *9-10 (W.D. Pa. Dec. 28, 2012) (decision to exclude zero dollar claims from sampling frame was supported by substantial evidence), aff'd sub nom. John Balko & Assocs., Inc. v. HHS, 555 F. App'x 188, 192-94 (3d Cir. 2014); Superior Home Health Servs., L.L.C. v. Azar, No. 15-cv-00636, 2018 WL 3717121, at *5-8 (W.D. Tex. Aug. 3, 2018) (upholding sampling and extrapolation process excluding zero-paid claims).

Thus, Ashli's interpretation of § 8.4.3.2.1.B is contrary to the plain language of the Manual, and Medicare is not required to include zero-paid claims in its statistical analysis.[13]

_____

[13]  The primary case which plaintiff uses to support its argument that zero-paid claims must be included in the universe

1                   b.    Procedural Due Process

2              To determine whether the exclusion of zero-paid claims

3    violates plaintiff's right to due process, the court must

4    consider the three factors set forth in Mathews, 424 U.S. at 333-

5    35.

6              First, defendant's interest in excluding zero-paid

7    claims is twofold: increasing the efficiency of the claim review

8    process and minimizing waste of government funds.  See MedEnvios,

9    725 F. Supp. 3d at 1349-50.  HHS, "like every federal agency, has

10   ample reason to ensure that it does not waste the people's money

11   . . . . Delayed recoupment of overbilling puts Medicare at risk,

12   and other government programs too."  A1 Diabetes & Med. Supply v.

13   Azar, 937 F.3d 613, 619-20 (6th Cir. 2019).  Excluding zero-paid

14   claims allows Medicare to narrow the scope of its post-payment

15   audit and thus reduce the burden of that process.

16             Further, the inclusion of zero-paid claims would

17   contravene the purpose of an overpayment review, which aims to

18   "audit fully and partially paid claims -- not claims that the

19   Department never paid and by definition could not have resulted

20   of claims is inapposite.  See Goose Creek Physical Med., LLC v.

21   Becerra, No. 22-cv-03932, 2024 WL 3992721, at *11 (D.S.C. Aug. 5,
     2024), reconsideration denied, 2024 WL 3653639, at *1, *12

22   (D.S.C. Aug. 29, 2024).  There, the court concluded that "the
     'target universe' . . . includes 'zero-paid' claims," but it only

23   did so as a discovery sanction against defendant before reaching
     the merits of the provider's procedural due process claims.  Id.

24             Another case where a court ruled against the Secretary

25   under similar circumstances is Central Louisiana Home Health
     Care, L.L.C. v. Price, No. 17-CV-00346, 2018 WL 7888523, at *20-

26   21 (W.D. La. Dec. 28, 2018), report and recommendation adopted,
     2019 WL 1388773, at *1 (W.D. La. Mar. 27, 2019).  But there, the

27   Secretary did not prevail because the agency did not produce a
     statistical analysis with sufficient precision.  See id. at *19-

28   20.  Plaintiff does not raise such an argument here.

1  in overpayment" and therefore have no waste associated with them.

2  See MedEnvios, 725 F. Supp. 3d at 1349-50.  Indeed, including

3  zero-paid claims in the sample would incentivize providers to

4  submit frivolous Medicare claims in order to dilute the universe

5  used to extrapolate overpayments, contributing to further

6  inefficiency and waste.  See Compass Lab'y, 2024 WL 1289696, at

7  *5-6.

8       Second, plaintiff's interest in including zero-paid

9  claims is to retain more of its money.  See MedEnvios, 725 F.

10  Supp. 3d at 1347-48 (Providers "do have a property interest in

11  their own money.") (emphasis omitted).  If Medicare were to

12  include zero-paid claims in the universe and sample of claims,

13  this alternative process would decrease its extrapolated

14  overpayment demand.  This is because "[t]he more total claims

15  that are considered, the less of an impact any overpaid claim

16  will have.  The more claims included in the universe for the

17  eventual sample to be selected from, the better the odds of

18  diminishing the extrapolating impact of overpayments for the

19  provider seeking reimbursement."  See Compass Lab'y, 2024 WL

20  1289696, at *6 (cleaned up).

21       Third, plaintiff contends that if improperly denied

22  zero-paid claims are excluded, the sample would overestimate the

23  amount of overpayment, creating an alleged risk of erroneous

24  deprivation of plaintiff's property.  In other words, any alleged

25  underpayments would balance out some of the overpayments.

26       However, Medicare has already "provided for a separate

27  process for suppliers to challenge determinations that

28  incorrectly result in 'zero-paid' claims," which is distinct from

defendant's "own investigation and recoupment of its potentially wasteful spending."  MedEnvios, 725 F. Supp. 3d at 1350 (citing 42 U.S.C. § 1395ff(a)(3)); see also Compass Lab'y, 2024 WL 1289696, at *6 (citing 42 C.F.R. § 405.921(b)) (same). After receiving a claim, Medicare sends notice of a claim's initial determination to Ashli, and it must contain "the basis for any full or partial denial determination of services or items on the claim," "information on the right to a redetermination if the provider or supplier is dissatisfied with the outcome of the initial determination," and "all applicable claim adjustment reason and remark codes to explain the determination."  42 C.F.R. § 405.921(b).

Thus, plaintiff has always had all the information it needed to appeal the denial of a claim or seek reopening, and if any claims received no payment, plaintiff either did not appeal that denial, failed to get that denial overturned during the administrative appeals process, or failed to seek reopening of that claim.[14]  Given plaintiff's ability to appeal initial determinations on zero-paid claims, the exclusion of zero-paid claims from the statistical sample creates little, if any, risk of erroneous deprivation.[15]

---

[14]    The 120-day deadline to appeal any initial claim denials appears to have passed well before defendant began its audit.

[15]    Ashli argues that these appeal rights are inadequate because an overpayment audit extinguishes its right to appeal initial determinations.  However, Ashli provides no authority that supports this proposition, and it points to no particular claim for which its appeal right was extinguished nor any claim determination which it intended to appeal but was unable to because of the audit.

21

1    For the above reasons, defendant's exclusion of zero-

2  paid claims from the statistical universe did not violate

3  plaintiff's procedural due process rights, and summary judgment

4  for defendant will be granted on Count 1.

5          2.    Count 2: Failure to Provide Plaintiff with
                "Universe" File with Zero-Paid Claims

6

7    As the court understands plaintiff's second claim, it

8  is dependent on its first claim.  Ashli argues that defendant

9  violated its procedural due process rights by not including zero-

10  paid claims in the spreadsheet it provided to Ashli during the

11  review process that listed all of the claims within the universe

12  of audited claims.  It is hard to understand how including such

13  information in the spreadsheet would possibly serve either

14  Medicare's or the plaintiff's interests if, as the court has

15  held, the zero-paid claims were properly excluded from the

16  universe.

17    Applying the Mathews factors to this claim, defendant's

18  interest in disclosing the instant universe of claims is to

19  accurately inform plaintiff of which claims it considered during

20  the sampling and extrapolation process.  Plaintiff's interest is

21  to receive notice of what defendant considered in drawing a

22  sample and conducting its extrapolation.  The file provided did

23  precisely that by informing plaintiff which claims Medicare

24  audited, which claims are in the universe, and which claims are

25  in the sample for extrapolation.

26    Providing plaintiff with a list of zero-paid claims

27  would accomplish little.  By virtue of the initial claims

28  submission and review process that already took place prior to

1   the audit, plaintiff already knew which of the claims it

2   submitted that were denied and therefore received no payment.

3   Indeed, providing a universe including zero-paid claims would

4   disserve plaintiff's own interests.  If defendant were to include

5   zero-paid claims in the disclosure made to plaintiff without

6   considering them, it would in fact mislead plaintiff, which is

7   contrary to procedural due process.

8          Finally, there was zero risk of erroneous deprivation

9   engendered by the government's existing process of providing a

10  spreadsheet that accurately reflects the information it

11  considered.  Accordingly, the government's failure to include

12  zero-paid claims in the universe file did not violate procedural

13  due process, and summary judgment for defendant will be granted

14  on Count 2.

15              3.   Count 3: Failure to Provide Recalculation

16                   Worksheets[16]

17  [16]    The government contends that plaintiff's claims
    regarding the worksheets, recoupment, and accounting were not
18  properly presented below nor were they properly exhausted.  The
    court assumes, without deciding, that these claims were properly
19  presented and exhausted.  See, e.g., D&G Holdings, L.L.C. v.
    Becerra, 22 F.4th 470, 474-478 (5th Cir. 2022) (where overpayment
20  determination was overturned, district court had jurisdiction to
    resolve dispute regarding amount of improper recoupment because
21  "effectuations" of the agency decision "are inextricably
    intertwined with the initial exhausted agency action"); see also
22  Mathews, 424 U.S. at 329-30 (failure to raise a constitutional
    claim at the agency level did not bar plaintiff from raising that
23  constitutional claim later in a district court).  But see
    Pinnacle Peak Neurology, LLC v. Noridian Healthcare Sols., LLC,
24  773 F. App'x 910, 910-11 (9th Cir. 2019) (amount of payment
    determined by contractor after ALJ decision "is a new initial
25  determination" under 42 C.F.R. § 405.1046(a)(3) and claim
    regarding such determination must be presented and exhausted)
26  (emphasis omitted).  (See also Docket No. 34 (noting that "[t]he
    topic of overpayment recalculations was entirely unaddressed by
27  the ALJ's decision, nor did plaintiff raise it before the ALJ

28

                                  23

1          In its third claim, Ashli argues that defendant

2  violated procedural due process by not providing it with

3  recalculation worksheets after each of its administrative appeals

4  where the government's overpayment demand decreased.  See

5  MedEnvios, 725 F. Supp. 3d at 1350-51.  Plaintiff is not

6  requesting any worksheets in connection with the initial

7  overpayment demand, because it got those worksheets.  Nor is it

8  directly claiming that defendant erred in recalculating the

9  overpayment demand after any of the appeals below.

10          In other words, as the court understands it, plaintiff

11  argues that the defendant should have expended public funds to

12  create a spreadsheet that does not already exist, using data that

13  plaintiff already has.  Maybe that would have been of some help

14  to plaintiff, but it certainly was not required by the Due

15  Process Clause of the Constitution.  Plaintiff had the

16  information at its disposal to check the recalculated demands

17  with the paperwork produced by the government after each

18  administrative appeal.  Each of the three appeal decisions

19  discussed the various claims submitted on behalf of certain

20  beneficiaries on specific dates and listed "CPT codes" for those

21  services, thereby allowing plaintiff to identify which claims

22  within the 90-claim sample were disallowed or allowed in whole or

23  in part at each level.[17]

24

25  beyond a passing reference" and that the overpayment
recalculations "were not at issue in any of the decisions through

26  the relevant appeals process, which did not provide calculations
of the overpayment owed").)

27

28     [17]  For illustration, the court provides one example of the
review process for one particular claim.  Plaintiff received

1    Looking to the Mathews factors, defendant's interest in

2  not providing recalculation worksheets for each recalculated

3  demand is in maintaining an efficient process to return any money

4  Ashli should have kept in the first place.  Requiring defendant

5  to provide new recalculation worksheets with each appeal where

6  the demanded overpayment amount changes would slow down that

7  process and increase the administrative burden of the already

8  lengthy and complicated appeals process.  On the other hand,

9  plaintiff's interest in receiving the recalculation worksheets

10 consists simply in making it a little easier for it ensure that

11 the overpayment recalculations after each level of appeal were

12 correct.  See Mathews, 424 U.S. at 333-35.  And plaintiff's

13 access to the underlying decisions that prompted the

14 recalculations, as well as its failure to challenge the ALJ's

15 findings as to any individual claim, undercut the notion that

16 there is any risk of erroneous deprivation of plaintiff's

17 payment for a portable ventilator under procedure code E0466,
   prescribed to "Beneficiary 4" for "shortness of breath, chronic
18 obstructive pulmonary disease, and chronic respiratory failures,"
   with a date of service of July 19, 2020.  (R. at 3197.)  The
19 claim was disallowed during the post-payment review process for
   insufficient documentation, and on appeal, contractors Noridian
20 and then Maximus also found that there was insufficient
   documentation of medical necessity and affirmed the disallowance
21 of that claim.  (R. at 4460, 6121-22.)  The ALJ ultimately
   disagreed and reversed that disallowance after finding that there
22 was sufficient medical documentation for the ventilator under
   Medicare regulations, based on his review of the documents.  (R.
23 at 378-79.)  (The ALJ's opinion listed the beneficiary as
   Beneficiary 4, though the decisions by the contractors listed the
24 patient's actual name, as well as the beneficiary's Medicare
   identification number and the claim number.)  If the court can
25 put that information together, plaintiff certainly could have
   done so.  The procedural history of this claim is one example
26 among many showing that plaintiff had full notice of which claims
   were allowed or disallowed at every level of review.

27

28

25

1   property.  Therefore, defendant's failure to provide

2   recalculation worksheets did not violate procedural due process,

3   and summary judgment will be granted for defendant on Count 3.[18]

4           4.   Count 4: Improper Recoupment

5           In essence, plaintiff's fourth claim is that because of

6   defendant's alleged due process violations in Counts One through

7   Three, it is entitled to a suspension of any ongoing recoupment

8   of the alleged overpayment by Medicare and a refund on all

9   improperly recouped amounts.  (See FAC ¶¶ 268-72; Pl.'s Mot. for

10  Summ. J. (Docket No. 40-1) at 35-37 (arguing that the recoupment

11  was improper based on the procedures employed during the

12  overpayment calculation and appeals process).)  To infer that

13  adds anything to the first three claims would be to give

14  plaintiff too much credit.

15          Because Counts One through Three fail, Count Four fails

16  for the same reasons.  Further, even assuming this court had

17  determined that the overpayment demand was improper, plaintiff

18  "is adequately protected . . . because it is entitled to receive

19  back those funds, with interest," under statute, and thus

20  defendant's recoupment is not "a corresponding due process

21  violation."  See MedEnvios, 2024 WL 4894677, at *6 (citing 42

22  U.S.C. § 1395ddd(f)(2)(B)); see also Ramtin Massoudi MD Inc. v.

23  Azar, No. 218CV1087, 2018 WL 1940398, at *9 (C.D. Cal. Apr. 23,

24  2018) ("[T]he four-level administrative appeals process provides

25      [18]    Plaintiff relies in part on MedEnvios, 725 F. Supp. 3d

26  at 1350-51, for the proposition that it is entitled to the
    recalculation worksheets.  The court disagrees with the MedEnvios

27  court's determination that a provider cannot challenge a
    statistical sample and extrapolation without the recalculation

28  demand worksheets, for the reasons discussed above.

1   plaintiff with an adequate remedy because, should plaintiff

2   prevail in that process, it will be repaid any amounts that were

3   unnecessarily recouped plus interest.") (citing 42 U.S.C. §

4   1395ddd(f)(2)(B)).

5        Accordingly, summary judgment will be granted for

6   defendant on Count 4.

7             5.   Count 5: Accounting

8        Plaintiff's fifth claim alleges that its due process

9   rights were violated because defendant failed to conduct a proper

10  accounting of the payments made by plaintiff towards the

11  overpayment demand.  To the extent plaintiff alleges an

12  accounting is necessary because of the alleged violations

13  discussed in Counts 1 through 4, the claim fails because

14  plaintiff has not shown an underlying violation of its due

15  process rights, for the reasons discussed above.

16       The accounting claim also fails to the extent it seeks

17  to allege an independent due process violation.  In terms of the

18  due process factors under Mathews, plaintiff's private interest

19  is in ensuring that it paid the proper amount of overpayments and

20  that it could seek a refund if necessary.  However, plaintiff has

21  its own records and knows how much it paid to Medicare in

22  overpayments and how much was refunded after each level of

23  administrative review.  Plaintiff also has the documentation

24  provided by defendant and the administrative decisions

25  identifying which claims within the 90-claim sample were allowed

26  or disallowed, such that it may scrutinize the recalculated

27  overpayment demand, albeit not as conveniently as it would prefer

28  due to not having the worksheets or a formal accounting from

1   Medicare.

2           In contrast, the public interest weighs against the
3   unnecessary expenditure of public resources in providing an
4   accounting, since defendant already provided plaintiff with
5   multiple levels of administrative review and thousands of pages
6   of documentation.  Providing an accounting would simply add to
7   the burden of this already extensive review process.  The risk of
8   erroneous deprivation is also low because plaintiff does not
9   challenge defendant's general use of statistical sampling and
10  extrapolation to determine overpayment amounts nor defendant's
11  determinations as to any of its individual Medicare claims.  Nor
12  is plaintiff claiming that the recalculated overpayment demand
13  was calculated incorrectly -- instead, it is simply hypothesizing
14  that defendant <u>may</u> have committed an error.

15          Thus, applying <u>Mathews</u> to the facts of this case, due
16  process does not require defendant to provide an accounting of
17  the payments made by plaintiff on the overpayment demand.[19]
18  Accordingly, summary judgment will be granted for defendant on
19  Count 5.

20  IV.  <u>Conclusion</u>

21          From the time it received the original overpayment
22  demand, Ashli filed three written appeals and was afforded oral
23  argument before an ALJ in which it had the opportunity to stake

24  _____

25          [19]    The court is only aware of one decision finding that a
    similarly situated plaintiff was entitled to an accounting of
26  overpayments.  However, in that case, the court granted summary
    judgment for the plaintiff on the accounting claim with no
27  further discussion because the parties agreed at oral argument
    that the plaintiff was entitled to an accounting.  <u>See</u> <u>MedEnvios</u>,
28  2024 WL 4894677, at *6-7.

1    out its position.  In response to those appeals, Ashli received

2    three lengthy and reasoned written decisions, each of which

3    represented a partial victory for Ashli.  Beyond that, Ashli had

4    the separate opportunity to seek review of every single claim

5    determination it received, including the zero-paid claims.  And

6    it is now exercising its right of further review by this court.

7          To be sure, the process Ashli received was not perfect.

8    But "[d]ue process does not require perfect process." Thibodeaux

9    v. Bordelon, 740 F.2d 329, 338 (5th Cir. 1984); see also Newman

10   v. Massachusetts, 884 F.2d 19, 24 (1st Cir. 1989) (procedural due

11   process does not establish that a plaintiff is "entitled to

12   'perfect' process").  All that is required is the right to be

13   "heard at a meaningful time and in a meaningful manner." See

14   Mathews, 424 U.S. at 333 (cleaned up).  Ashli has received that

15   several times over.  The multiple layers of thorough

16   administrative proceedings gave plaintiff ample, even if

17   imperfect, process, "reasonably tailored to the aims of the

18   audit." See MedEnvios, 725 F. Supp. 3d at 1350.

19          If Medicare were to undertake an overpayment

20   extrapolation and review process that went beyond the painstaking

21   procedures already provided to Ashli, it would not be long before

22   the costs of administration would, if they do not already, exceed

23   the costs of the care provided to the patients who are the

24   intended beneficiaries of the Medicare program.  As the Supreme

25   Court so wisely observed, "the cost of protecting those whom the

26   preliminary administrative process has identified as likely to be

27   found undeserving may in the end come out of the pockets of the

28   deserving since resources available for any particular program of

1   social welfare are not unlimited." <u>Mathews</u>, 424 U.S. at 348.

2          For the foregoing reasons, the court finds that the

3   Secretary's actions were lawful under the standard set forth in

4   5 U.S.C. § 706(2), and IT IS THEREFORE ORDERED that defendant's

5   motion for summary judgment (Docket No. 39) be, and the same

6   hereby is, GRANTED, and plaintiff's motion for summary judgment

7   (Docket No. 40) be, and the same hereby is, DENIED.  The Clerk is

8   directed to enter final judgment in favor of defendant and close

9   the case.

10  Dated:  April 16, 2025

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

30